UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LINNEA GARCIA-TATUPU,          )
                               )
      Plaintiff,               )
                               )
v.                             )          CIVIL ACTION NO.
                               )          16-11131-DPW
BERT BELL/PETER ROZELLE NFL    )
PLAYER RETIREMENT PLAN, and    )
THE NFL PLAYER SUPPLEMENTAL    )
DISABILITY PLAN                )
                               )
      Defendants.              )


MEMORANDUM AND ORDER
April 18, 2017

The Defendants in this ERISA matter, involving the claim of
a divorced spouse for pension benefits as a result of a *nunc pro
tunc* state court judgment, have moved to dismiss the action.
The complaint has been supplemented by the parties with most —
but not all — documents referenced in the pleading.  I will deny
the motion to dismiss as now argued and in this Memorandum
outline the need for further record development that may permit
early and definitive dispositive judgment practice.

## I. BACKGROUND

In connection with the motion to dismiss now before me, I
recite the facts as asserted in the complaint and as properly
supplemented.  I draw all reasonable inferences in the

Plaintiff's favor. *Alternative Energy, Inc*. v. *St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

Plaintiff, Linnea Garcia-Tatupu married Mosiula F. Tatupu on July 1, 1978. Mosiula Tatupu resided in Wrentham, Massachusetts and was a player in the National Football League from 1978 to 1991; he was also a member of the National Football League Players Association. On December 12 1997, the Plaintiff and Mosiula Tatupu divorced. According to the allegations of the complaint, the divorce judgment entitled Linnea Garcia-Tatupu to receive pension benefits paid to Mosiula Tatupu. Mosiula Tatupu died on February 23, 2010. The Norfolk County Probate and Family Court, which had entered the divorce decree, entered an order on October 5, 2012 directing that a domestic relations order entered on December 29, 2011 be applied *nunc pro tunc* to September 24, 1997.

One of the Defendants is the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan") the entity recognized under the Employment Retirement Income Security Act (ERISA) to administer the applicable retirement plan. The other named Defendant is The NFL Supplemental Disability Plan (the "Disability Plan"), which is also recognized under ERISA to

administer the retirement plan at issue here.  For purposes of this motion, the focus will be on the Retirement Plan.[1]

The Plaintiff requested pension benefits through the Retirement Plan in accordance with the December 29, 2011 domestic relations order.  That request was denied through a letter dated March 23, 2012.  The Plaintiff appealed the Plan's denial of benefits decision, but the initial decision was upheld in a December 20, 2012 decision.  The plaintiff asserts that the December 20, 2012 denial of pension benefits by the Retirement Plan was wrongful.

Before me is a motion the Defendants have filed to dismiss the Plaintiff's claim on two grounds: (1) improper venue, and (2) failure to state a claim upon which relief may be granted. I will deny the motion to dismiss (and the related motion to transfer venue).  Because of its relevance to the question of a viable claim over the longer term, I also preliminarily consider grounds under which the Retirement Board might be held to have

---

[1] In their Memorandum in support of their Motion to Dismiss, the Defendants contend that the Disability Plan no longer exists, at least by that name.  Michael B. Miller, the Plan Director of the Disability and Retirement Plan states in his Declaration that the Disability Plan is now known as the NFL Player Disability and Neurocognitive Benefit Plan.  In any event, it is unclear that a disability plan is implicated in this litigation. Whether the Disability Plan should remain as a defendant will be a topic of a future scheduling order.

3

erred in their denial of benefits decision and in doing so frame further dispositive motion practice.

## II. SETTLING ON A VENUE

The Defendants claim that venue in Massachusetts is improper under ERISA. ERISA provides that: "Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found . . . ." 29 U.S.C. § 1132(e)(2). The parties do not dispute that a breach, if any, took place in California, because that is where the Plaintiff now resides and the impact of the denial was experienced. It is also not disputed that the Defendants reside in Maryland, because that is where the Defendant is headquartered. Where the plan is administered and where the Defendant may be "found" are, however, disputed by the parties. Focusing on the issue of where the Defendant may be "found," the Defendant argues that the Plan is only found in Maryland, while the Plaintiff contends that the Plan is also found in Massachusetts.

The term "where the defendant may be found" has been construed liberally. *Varsic* v. *U.S. Dist. Court for Cent. Dist. of California*, 607 F.2d 245, 248 (9th Cir. 1979). In adopting this liberal construction, the Ninth Circuit considered the similarly liberal constructions of "found" in other contexts,

4

such as in anti-trust and copyright disputes.  *Id.*  The *Varsic*
court used the minimum contacts test of *International Shoe Co.*
v. *Washington*, 326 U.S. 310 (1945) to determine where the
defendant was "found."  *Id.* at 248-49; *see also Waeltz* v. *Delta
Pilots Ret. Plan*, 301 F.3d 804, 810 (7th Cir. 2002) ("We believe
that the decision in *Varsic* is correct.  A fund can be found in
a judicial district if it has the sort of "minimum contacts"
with that district that would support the exercise of personal
jurisdiction under the rule of *International Shoe Co.* v.
*Washington*, 326 U.S. 310 (1945).").  *Varsic* also made clear that
the defendant need not be "found" only where the plan is
administered.  *Id.*  Two of my colleagues have followed the
*Varsic* court's liberal construction of where a plan may be
"found."  *See Kaufmann* v. *Prudential Ins. Co. of Am.*, 667 F.
Supp. 2d 205, 207 (D. Mass. 2009) (Stearns, J); *Cole* v. *Cent.
States Se. & Sw. Areas Health & Welfare Fund*, 225 F. Supp. 2d
96, 102 (D. Mass. 2002) (Wolf, J) (adopting magistrate judge's
report and recommendation, which itself followed *Varsic*).

Under *Varsic*'s teaching, a defendant may be found in a
district in which he has "certain minimum contacts with it such
that the maintenance of the suit does not offend traditional
notions of fair play and substantial justice."  *Cole*, 227 F.
Supp. at 198 (quoting *International Shoe*, 326 U.S. at 316).
"The defendant's conduct must make it reasonable that the

defendant would anticipate being haled into court here." *Id.*
(citing *World-Wide Volkswagen* v. *Woodson*, 444 U.S. 286, 297
(1980)).  Additionally, "[w]here the defendant's activities
connected to the forum are not 'continuous and systematic,' the
litigation must result from alleged injuries that arise out of
or are related to those activities." *Id.* (ci ting *Burger King
Corp.* v. *Rudzewicz*, 471 U.S. 462, 476 (1985)).

The Plaintiff argues that the Plan has sufficient minimum
contacts with Massachusetts because of its provision of benefits
to players affiliated with the New England Patriots football
team in Foxborough, Massachusetts.  In *Varsic*, the plaintiff's
complaint was brought in the United States District Court for
the Central District of California, and the defendant sought to
dismiss or to transfer the action to the Southern District of
New York.  *Varsic*, 607 F.2d at 247.  In evaluating whether the
defendant was "found" in the Central District of California by
applying the minimum contacts test, the *Varsic* court observed
that the defendant received contributions from employers on
behalf of employees working in the Central District of
California and that the defendant provided benefits to some
beneficiaries residing in the district.  *Id.* at 249.  Since the
fund purposefully placed itself in a fiduciary capacity and
received contributions generated from the forum, the *Varsic*
court ultimately determined that there was specific

jurisdiction, and that the defendant was "found" in the Central District of California. *Id.* at 250.

Similarly here, even though the Plaintiff's alleged benefits were denied while she was living in California, the denial directly involved the fund's activities in the District of Massachusetts. The Plaintiff and Tatupu lived in and accrued the right to pension benefits within the District of Massachusetts while Tatupu played football in this District for the New England Patriots. Additionally, I note that as in *Varsic*, the Defendants here did not oppose to this court's exercise of personal jurisdiction, presumably conceding minimum contacts with this jurisdiction.

In *Waeltz*, the Seventh Circuit dismissed a case for improper venue where only two participants of the plan lived in the area covered by the court's jurisdiction and there were no other meaningful contacts between the plan and that district. *Waeltz*, 301 F.3d at 811. The plaintiffs, Waeltz and Johnson, lived in Florida and the Southern District of Illinois, respectively. *Id*. at 805-06. Neither received benefits in the Southern District of Illinois, since Johnson had not yet retired. *Id*. at 806. Furthermore, neither plaintiff earned any benefits in the Southern District of Illinois because neither had performed any work there. *Id*. Tatupu, to be sure, had also not begun receiving benefit payments, but unlike the

plaintiffs in *Waeltz*, Tatupu earned benefits in the District of

Massachusetts while employed with the New England Patriots

football team.  I am satisfied the Defendants are "found" in

Massachusetts and venue is proper here under ERISA.

The Defendants also argue that regardless of whether venue

is proper in Massachusetts, I should use my discretion to

transfer this case to Maryland.  Under 29 U.S.C. 1404(a), venue

may be transferred to another district or division where the

case might have been brought "[f]or the convenience of parties

and witnesses," or "in the interest of justice."  Simply because

venue is proper in a particular jurisdiction, of course, does

not make it appropriate.  *Kaufmann*, 667 F. Supp. 2d at 207.

District courts have broad power to transfer cases, and in doing

so, must weigh both private and public interests.  *Id.* at 208.

Private interests include: relative ease of access to sources of

proof, availability of compulsory process, comparative trial

cost, and ability to enforce a judgment.  *Id.* at 208.  Public

interests include: practical difficulties of unnecessarily

imposing upon a busy court (or citizens called to jury duty),

the obligation to hear a case more fairly adjudicated elsewhere,

and having a judge more familiar with relevant law make the

requisite legal determinations.  *Id.* at 208.  Of the factors

identified, the convenience of expected witnesses is generally

most salient.  *Id.* at n. 4 (quoting *Boateng* v. *Gen. Dynamics Corp.*, 460 F.Supp.2d 270, 275 (D. Mass. 2006)).

But there are no expected witnesses in the traditional sense here; I will ultimately decide this case through dispositive motion practice based on the administrative record used by the Plan to determine that the Plaintiff was ineligible for benefits.  Similarly, the location of documents and ease of access to evidence are not factors that weigh heavily here because the operative documents are limited in scope.  It should be noted, nevertheless, that relevant court orders and the divorce judgment at issue were obtained in Massachusetts courts.

The thrust of the Defendants' argument to transfer venue centers on the belief that the convenience of parties weighs heavily in favor of shifting the venue to Maryland.  The Defendants reason that this will lessen the burden on the Plan, and its beneficiaries, because the travel related expenses will be lessened.  The Defendants observe that a change of venue to Maryland is not any less convenient to the Plaintiff, who resides in California.  Although the Plaintiff's counsel is located in Massachusetts, that factor does not as such weigh heavily in decision.  *See Dearing* v. *Sigma Chem. Co.*, 1 F. Supp. 2d 660, 665 (S.D. Tex. 1998).  What I do weigh heavily, however, is the strong presumption in favor of the Plaintiff's choice of forum.  *Coady* v. *Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir.

2000).  The Defendant has the burden of "establish[ing] that, on balance, the interests of justice and convenience weigh heavily in favor of transfer."  *Boston Post Partners II, LLP* v. *Paskett*, No. 15-13804-FDS, 2016 WL 3746474, at *9 (D. Mass. July 8, 2016) (quoting *Systemation, Inc.* v. *Engel Indus.*, 992 F. Supp. 58, 64 (D. Mass. 1997)).  The Defendants have not done so here.  The purported inconvenience and expense of travel to Boston from Maryland for the Defendants' representatives is not enough to tip the scale against the Plaintiff's chosen forum.

The Defendants have failed to meet their burden of showing that any inconvenience of litigating in Massachusetts is sufficiently burdensome to justify disturbing the Plaintiff's choice of venue and support either outright dismissal or transfer.

### III. STATING A CLAIM

The Defendants are also seeking to dismiss the Plaintiff's complaint on grounds it does not contain enough facts to state a plausible cause of action.

### A.   *Standard of Review*

A complaint may not be dismissed under Rule 12(b)(6) if the complaint provides a "short and plain statement showing that the pleader is entitled to relief."  *Ocasio-Hernandez* v. *Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)).  A "short and plain statement" is only required to

provide enough detail to give the defendant "fair notice of what
the . . . claim is and the grounds upon which it rests," but the
complaint must also contain enough factual material to "raise a
right to relief above the speculative level on the assumption
all the allegations in the complaint are true (even if doubtful
in fact)." *Id.* at 12 (quoting *Bell Atl. Corp.* v. *Twombly*, 550
U.S. 544, 555 (2007)). In sum, a complaint is adequate when it
provides fair notice to the defendants and states a facially
plausible legal claim. *Id.*

## B.   *Supplemental Materials*

The Defendants submitted supplemental documents with their
motion to dismiss. When a party submits supplemental materials
outside of the pleadings as part of the motion to dismiss, the
motion is typically treated as a motion for summary judgment.
*Chebotnikov* v. *LimoLink, Inc.*, 150 F. Supp. 3d 128, 130 (D.
Mass. 2015). An exception is made, however, for "documents the
authenticity of which are not disputed by the parties; for
official public records; for documents central to plaintiffs'
claim; or for documents sufficiently referred to in the
complaint." *Alternative Energy, Inc.* v. *St. Paul Fire and
Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

The documents submitted to me in connection with the
motions include the Plan and the Retirement Board's decision to

deny benefits.  These items are expressly referenced in the complaint and are central to the complaint.

## C.    *Failure to State a Claim*

The Defendants contend that the Plaintiff's complaint does not provide facts that plausibly explain why she is entitled to relief.  This contention will likely be informed by the standard of review to be applied.

The First Circuit has held that when an ERISA plan provides plan administrators "with the authority and discretion to interpret the plan and to determine eligibility for benefits, we must uphold the administrator's decision unless it was arbitrary, capricious, or an abuse of discretion."  *O'Shea through O'Shea* v. *UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016) (internal quotation marks omitted) (quoting *Niebauer* v. *Crane & Co.*, 783 F.3d 914, 922-23 (1st Cir. 2015)).  The analysis in such circumstances is focused on "whether the record as a whole supports a finding that the plan administrator's decision was plausible or, put another way, whether the decision is supported by substantial evidence in the record."  *Id.* (internal quotation marks omitted); *see also Denmark* v. *Liberty Life Assur. Co. of Boston*, 566 F.3d 1, 9 (1st Cir. 2009) (". . . judicial review of such a benefit-denial decision is for abuse of discretion.").  ERISA benefit-denial cases are typically decided on the record before the plan administrator.  *Nicholas* v. *Cigna Life Ins. Co.*

*of N.Y.*, No. 14-CV-14117-ADB, 2016 WL 755612, at *2 (D. Mass. Feb. 25, 2016); *Denmark*, 566 F.3d at 10.

By contrast, the Retirement Plan's construction and interpretation of a domestic relations order is given *de novo* review. *Owens v. Auto. Machinists Pension Trust*, 551 F.3d 1138, 1142 (9th Cir. 2009). Here, the Retirement Plan construes the Plaintiff's domestic relations order; consequently, its decision is reviewed *de novo* with respect to that issue.

The Defendants argue that the Plaintiff failed to plead plausibly the elements required to state a claim under the abuse of discretion standard. In her complaint, the Plaintiff merely states that "the defendant has wrongfully denied the plaintiff the above-referenced pension benefits." Since it appears — as more fully discussed below — that the challenged decision will ultimately be decided under *de novo* review, the Plaintiff is unlikely to be required to plead that the Retirement Board's decision was an abuse of discretion or arbitrary and capricious. In any event, while the Plaintiff's pleadings lack detailed facts, they are sufficient because they state a plausible claim for relief under ERISA. The motion to dismiss before me will be denied and this claim will be permitted to proceed.

## III. REVIEWING THE RETIREMENT BOARD DECISION

### A.  *Standard of Review*

A dispositive motion is appropriate when there are no
genuine issues of fact and the moving party is entitled to
judgment as a matter of law.  *Thompson* v. *Coca-Cola Co.*, 522
F.3d 168, 175 (1st Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).
As noted, I use an abuse of discretion standard for the
Retirement Board's determinations with respect to the Plan.  *See
Denmark*, 566 F.3d at 9.  Under an abuse of discretion standard,
the administrator's decision must be plausible and based on
evidence found in the record.  *Id.; see also Metro. Life Ins.
Co.* v. *Glenn*, 554 U.S. 105, 112 (2008) (conflicts of interest
should be taken into consideration as one factor in determining
whether there was abuse of discretion).  While the abuse of
discretion standard is applicable to the plan administrator's
interpretation of the plan itself, I review *de novo* the plan
administrator's decisions concerning whether a domestic
relations order is a qualified domestic relations order (QDRO)
under ERISA and the construction of that QDRO.  *Owens*, 551 F.3d
at 1142 ("We review *de novo* the district court's review of a
plan administrator's conclusions regarding legal obligations
under a QDRO.").  I am likely ultimately to review the
challenged decision here *de novo* because the Retirement Plan's
decision is based on an interpretation of court orders, and not

14

the Plan.  I use this occasion to shape discussion at a further
scheduling conference regarding the development of dispositive
motions.

**B.    *ERISA and QDROs***

ERISA is a federal regulatory scheme that governs employee
benefit plans; all benefit plans must conform with ERISA
reporting, disclosure, and fiduciary requirements.  *Boggs* v.
*Boggs*, 520 U.S. 833, 841 (1997).  Pension plans must also comply
with participation, vesting, and funding requirements.  *Id.*  As
a general matter, pension plans may not be assigned or
alienated.  29 U.S.C. § 1056(d)(1).  An exception to this
general rule is made for QDROs.  29 U.S.C. § 1056(d)(3).

The Retirement Equity Act of 1984 (REA) amended ERISA to
ensure pension income for surviving spouses.  *Boggs*, 520 U.S. at
843.  As specifically relevant to this case, the REA expanded
ERISA protections by providing that "if a vested participant
dies before the annuity start date, leaving a surviving spouse
to whom he has been married for at least one year, a qualified
preretirement survivor annuity shall be provided to the
surviving spouse."  *Hamilton* v. *Washington State Plumbing &
Pipefitting Indus. Pension Plan*, 433 F.3d 1091, 1095 (9th Cir.
2006); 29 U.S.C. § 1055(a)(2).

A qualified domestic relations order is defined, in part,
as a domestic relations order "which creates or recognizes the

existence of an alternate payee's right to, or assigns to an

alternate payee the right to, receive all or a portion of the

benefits payable with respect to a participant under the

plan . . . ." 29 U.S.C. § 1056(d)(3)(B)(i)(I). A domestic

relations order is considered a QDRO only when certain

requirements are met under ERISA, 29 U.S.C. § 1056(d)(1)(C)-(D),

as will be discussed in greater detail below. I observe as a

general proposition that Linnea Garcia-Tatupu, as a former

spouse of a pension plan participant, may be treated as a

surviving spouse of the participant, and as such is treated as

meeting all of the applicable marriage requirements because she

was married to a plan participant for at least one year. 29

U.S.C. § 1056(d)(1)(F); 29 U.S.C. § 1055(f).

## C.    *Analysis*

The Plaintiff asserts in her complaint that "according to

the judgment of divorce" she was entitled to certain pension

benefits. The divorce decree has not been produced in the

record at this time. The Plaintiff has submitted a court order

titled "Qualified Domestic Relations Order," dated December 29,

2011; which was ordered to apply *nunc pro tunc* as of October 5,

2012 to the date of divorce on September 24, 1997. As explained

above, a QDRO serves as a "limited exception to the pension plan

anti-alienation provision in ERISA and allows courts to

recognize a nonparticipant spouse's community property interest

in pension plans under specific circumstances." *Boggs*, 520 U.S. at 839; *see* 29 U.S.C. § 1056(d)(1); 29 U.S.C. § 1056(d)(3)(A).

The Retirement Plan's decision to deny benefits was based on three reasons:

First, that the "retirement benefits are not payable where a Player dies before he has made an election to receive retirement benefits under the Plan," because these retirement benefits only continue after a player's death "where the Player properly elected a form of benefits that includes payment after his death to his survivor." Tatupu received a partial lump-sum retirement payment while living, but he had not made an election with respect to the remainder of his pension.

Second, that there must be a surviving spouse at the time of the player's death for benefits to be paid, and Tatupu did not have a surviving spouse at the time of his death.

Third, that although QDROs can have a retroactive effect, Tatupu had neither a surviving spouse nor minor children, and so the QDRO cannot create a new benefit that is otherwise not payable.

Looking to the text of the Retirement Plan and the relevant provisions as cited by the Retirement Board, I assume, although the parties have not formally stipulated to this finding, that Tatupu was a "vested" player as a result of his long career in the NFL. Under Section 4.3 of the Retirement Plan, "[a] Vested

Player may elect to begin to receive benefits as of his Normal Retirement Date," and this election "must be filed in writing." Tatupu was 54 years old at the time of his death, since he played from 1978 to 1991, he could have elected to receive benefits as of his 45th birthday, making him eligible to receive benefits at the time of his death.

Upon electing to receive benefits, under section 4.4, beneficiaries are given the choice among several alternatives. Section 4.4 provides that an "unmarried Vested Player's monthly pension will be paid in the form of a 'life only pension.'" This pension payment is only payable during the player's lifetime. Married players are paid "in the form of a 'Qualified Joint and Survivor Annuity.'"

The pension plan also provides for two death benefit options; a surviving spouse may only elect one option, even if eligible for both. The first death benefit option, found in Section 7.2, is the Widow's and Surviving Children's Benefit, which applies to a player who at his time of death, but before the date that his retirement begins, was "a Vested Inactive Player." Under this circumstance, "his surviving Spouse . . . will . . . receive a monthly widow's and surviving children's benefit." The second death benefit option, under Section 7.3, describes the Spouse's Pre-Retirement Death Benefit, which provides that "if a married Vested Player dies before the date

his retirement benefits begin, his surviving Spouse will . . . receive payments . . . ."

Critically in this case, under the Retirement Plan, a "Spouse" refers to "a Player's lawful spouse . . . or a former spouse to the extent provided under a Qualified Domestic Relations Order as described in section 414(p) of the Code."

For a domestic relations order to be considered a QDRO certain requirements must be met: the order must (1) clearly set out certain facts (name, last known address of participant and alternate payee, amount/percentage of benefits to be paid by the plan to the alternate payee, the number of payments or period to which the order applies, and each plan to which the order applies), and (2) not alter the amount or form of benefits. 26 U.S.C. § 414(p); *see* 29 U.S.C. § 1056(d)(3)(c). An order that does not alter the amount or form of benefits is one that:

> (a) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, (b) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and (c) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

26 U.S.C. § 414(p).

While the assignment of benefits is generally prohibited under ERISA, 29 U.S.C. § 1056(d)(1), ERISA requires pension plans to pay benefits in accordance with the requirements set

out by a QDRO, 29 U.S.C. § 1056(d)(3)(A), and pension plans are given the authority to use reasonable procedures to determine the validity of QDROs, 29 U.S.C. § 1056(d)(3)(G)(ii). *Owens*, 551 F.3d at 1142-43.

The Retirement Board points out that the court order of December 29, 2011 was obtained more than 18 months after Tatupu's death. This is relevant because any determination that an order is a QDRO after the close of the 18 month period, beginning on the date on which the first payment would have been required to be made under the domestic relations order, is only applied prospectively. 29 U.S.C. § 1056 (d)(3)(H)(i)-(v). Nevertheless, while it appears there can be no retroactive payments to the Plaintiff, this 18-month limitation does not bar her from bringing this claim for prospective benefits. 29 U.S.C. § 1056(d)(3)(H)(iv).

In analyzing the Plaintiff's claim, I must determine whether her domestic relations order was a QDRO under ERISA. The Plaintiff here claims that she is entitled to rights under her 1997 divorce decree, which she alleges provides that she is entitled to a portion of Tatupu's pension benefits, and her *nunc pro tunc* court order that entitles her to treatment as a "surviving spouse" with respect to Tatupu's remaining benefits under the Plan. But the divorce decree has not been presented to me. In any event, the Retirement Board's denial hinges on an

interpretation of the domestic relations order as not being a QDRO because it provides "increased benefits" or "rights not otherwise available under the terms of the Retirement Plan."

A Tenth Circuit case dealing with a similar facts decided that "[b]ecause the *nunc pro tunc* order in the present case must be considered to have been entered before the death of the participant, it does not increase the benefits to be paid." *Patton* v. *Denver Post Corp.*, 326 F.3d 1148, 1152 (10th Cir. 2003) ("the very point of a *nunc pro tunc* order is the creation of a legal fiction that the order *did* exist as of the date to which it is made effective."). The Second Circuit has also held that a QDRO ordered after the death of a plan participant does not fail solely because of the time at which it was issued. *Yale-New Haven Hosp.* v. *Nicholls*, 788 F.3d 79, 85 (2d Cir. 2015), *reh'g denied*, 811 F.3d 541 (2d Cir. 2016) (posthumous *nunc pro tunc* orders were valid QDROs).

Other cases have, however, emphasized that an interest in pension benefits must be established before the beneficiary's death. *See Trustees of Directors Guild of Am.-Producer Pension Benefits Plans* v. *Tise*, 234 F.3d 415, 426 (9th Cir.), *opinion amended on denial of reh'g*, 255 F.3d 661 (9th Cir. 2000); *Samaroo* v. *Samaroo*, 193 F.3d 185, 187 (3d Cir. 1999). Establishing such an interest need not take the form of a QDRO, a suitable divorce decree that establishes rights to pension

benefits is enough when it creates the right to go back to
obtain an order that meets the criteria of a QDRO.  *See id.* at
421; *In re Gendreau*, 122 F.3d 815, 818 (9th Cir. 1997).

In *Samaroo* v. *Samaroo*, a divorced plaintiff's ex-husband
died with a vested right to a pension that provided a pre-
retirement survivor annuity, available to the surviving spouse
of a Plan participant who died after vesting but before
retiring.  193 F.3d at 187.  The divorce decree in *Samaroo* did
not state that the plaintiff was entitled to receive benefits
under her former husband's pre-retirement survivor's annuity.
*Id.*  Only after the ex-husband's death did the plaintiff obtain
a *nunc pro tunc* amendment to the divorce decree that created
such an entitlement.  *Id.*  The court decided, "because the
divorce decree did not mention any entitlement to such rights,
and in the absence of a surviving spouse or a QDRO designating
the former spouse as such, there was simply no pre-retirement
survivor's annuity payable."  *Id.*

The court reasoned that the amendment to the divorce decree
did not become a QDRO because the amendment required the plan to
provide benefits not otherwise provided.  *Id.*  The entitlement
to a survivor's annuity was determined on the day the
plaintiff's ex-husband died, and "the successful operation of a
defined benefit plan requires that the plan's liabilities be
ascertainable as of particular dates."  *Id.* at 190-91.  As of

the date that the plaintiff's ex-husband died, there was no
requirement to pay anyone under the plan, so the domestic
relations order increased the liability of the plan and did not
qualify as a QDRO. *Id.* The majority emphasized in a footnote
that the holding was limited to the facts of *Samaroo*, and did
not reach the broader issue of whether a QDRO could be modified
after death. *Id.* at n.3.

The Third Circuit later explicitly limited *Samaroo*'s
application further in *Files* v. *ExxonMobil Pension Plan*, noting
that in "*Samaroo*, the divorce decree was silent as to the pre-
retirement survivor's annuity," but that in *Files* the divorce
decree awarded a portion of the deceased's pension;
consequently, in *Files* an interest was created before the plan
participant's death regardless of whether the statutory
requirements for a QDRO were met at that time. 428 F.3d 478,
487 (3d Cir. 2005). The *Files* court held the wife was free to
obtain a revised state court order that met the QDRO
requirements in order to enforce the property interest conferred
upon her by the divorce decree. *Id.*

The Retirement Board here does not fully explain the
reasoning behind its decision, but it appears the Board was
taking the *Samaroo* approach to the Plaintiff's order. The
Board's denial of benefits decision stated that no benefits were
payable to any person at the time of Tatupu's death, suggesting

a view that the court order, obtained after Tatupu's death, created a new benefit not otherwise payable, preventing the order from being a valid QDRO.  However, if the Plaintiff's divorce judgment with Tatupu contemplated these pension benefits, the Retirement Board's analysis does not take into consideration the Plaintiff's preexisting rights under her divorce decree with Tatupu.  If the Plaintiff was granted rights to Tatupu's pension under her divorce decree, in accordance with *Files* a postmortem court order that complies with ERISA's statutory requirements does not create new benefits not otherwise payable.  As noted above, I do not — at this time — have the divorce decree, so I cannot decide whether the Plaintiff had a pre-existing interest in the pension.  Without this documentation, it will not be possible to make a dispositive determination on the merits.  Nevertheless, it appears this case can be resolved by dispositive motion practice.  I will convene a further scheduling conference to explore how to do so.

### IV. CONCLUSION

The Defendants' motion to dismiss for improper venue is DENIED; the Defendants' request to transfer venue is DENIED and the Defendants' motion to dismiss for failure to state a claim is DENIED.  The parties shall submit a joint scheduling proposal on or before April 28, 2017.

A further scheduling conference will be held at 3:30 p.m. on May 3, 2017.

 

 

/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE