UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LINNEA GARCIA-TATUPU,              )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )          CIVIL ACTION NO.
                                   )          16-11131-DPW
BERT BELL/PETE ROZELLE NFL         )
PLAYER RETIREMENT PLAN,            )
                                   )
        Defendant.                 )

MEMORANDUM AND ORDER
November 1, 2017

        Plaintiff, the ex-wife of a deceased professional football player, contends she is entitled to additional benefits on the basis of her Marital Property Agreement as refined by state court orders following her former husband's death.  The matter is governed by the federal Employee Retirement Income Security Act ("ERISA") provisions regarding state court orders concerning benefit plans relating to the provision of property rights to a former spouse.  29 U.S.C. § 1056(d)(3).  ERISA will not recognize the applicability of such a state court order, and treat it as a "Qualified Domestic Relations Order" for purposes of federal law, if the state order requires the plan to provide increased benefits.  *Id.* at § 1056(d)(3)(D)(ii).  The defendant Plan's Retirement Board denied the benefits plaintiff sought for that reason.

I conclude the state domestic relations order through which
plaintiff here seeks enforcement of her divorce decree has the
effect of increasing benefits beyond what was contemplated by
the plan from which she seeks benefits.  Accordingly, I will
direct that judgment enter for the defendant.[1]

## I. BACKGROUND

Plaintiff Linnea Garcia-Tatupu seeks benefits pursuant to a
retirement plan belonging to her ex-husband, the late Mosiula F.
Tatupu.  The Defendant, the Bert Bell/Pete Rozelle N.F.L. Player
Retirement Plan ("the Plan"), issued decisions written by the
Plan's Retirement Board on April 5, 2012; September 19, 2012;
and December 20, 2012 denying Ms. Garcia-Tatupu benefits she
claimed under the Plan after her ex-husband's death.

Ms. Garcia-Tatupu and Mosiula Tatupu were married on July
1, 1978.  Mosiula Tatupu was employed in the National Football
League from 1978 to 1991 and specifically by the New England
Patriots football team located in Foxborough, Massachusetts from
1978 to 1990.  The couple divorced on September 24, 1997.

The Marital Separation Agreement between Ms. Garcia-Tatupu
and Mosiula Tatupu entered September 24, 1997 sets out the

---

[1] The NFL Player Supplemental Disability Plan was originally also
named as a defendant, but in the parties' Joint Proposed
Scheduling Order [Dkt. No. 28], the plaintiff stipulated to the
dismissal of that defendant without prejudice.  *See Garcia-
Tatupu* v. *Bert Bell/Peter* [sic] *Rozelle NFL Player Retirement
Plan*, 249 F. Supp. 3d 570, 574 n.1 (D. Mass. 2017).

allocation of retirement/pension benefits as follows:

> At the time of Mosiula F. Tatupu's retirement and
> decision to draw pension benefits as may be available
> to him by virtue of his employment with the National
> Football League from 1978 through and including 1991,
> Mosiula F. Tatupu, shall pay to Linnea Garcia-Tatupu
> one-third (1/3) of the net benefit he receives from
> said pension benefit plan.  Mosiula F. Tatupu shall
> have exclusive right to decide, if, when, and how he
> wishes to receive said benefits, having the sole right
> to choose what payment option he desires without
> regard to the desires and/or wishes of Linnea Garcia-
> Tatupu.  Whatever payment option Mosiula F. Tatupu
> elects shall govern the time amount and manner of
> payments to Linnea Garcia-Tatupu.  Mosiula F. Tatupu
> shall remit the payments due to Linnea Garcia Tatupu
> within two (2) business days of his receipt of any
> payments of benefits under said plan.  Any and all
> benefits paid to Linnea Garcia-Tatupu by Mosiula F.
> Tatupu shall be deemed alimony payments.  Said
> benefits shall continue to be payable to Linnea
> Garcia-Tatupu subsequent to the death of Mosiula F.
> Tatupu, if the plan so provides, and if she survives
> Mosiula F. Tatupu, Linnea Garcia-Tatupu specifically
> waives any rights to receive any alimony and/or
> pension benefits in excess of the amount provided
> herein.  The parties agree to cooperate with any plan
> administrator in coordinating distribution of benefits
> so long as the distribution is consistent with the
> terms of this Agreement.

Mosiula Tatupu died on February 23, 2010 at the age of 54.
While he had elected to receive a lump-sum early payment
benefit, he had not begun receiving the remainder of his pension
benefits at the time of his death.  It appears that Mosiula
Tatupu provided Ms. Garcia-Tatupu with one-third of the early
lump-sum payment he elected.

On December 29, 2011, Ms. Garcia-Tatupu obtained a *post mortem* state court domestic relations order, in which the state court awarded her:

> 100% of the Player's [Mosiula Tatupu's] accrued benefit under the Retirement Plan, based on the Player's Credited Seasons earned as of the date of this order and the terms of the Plan in effect as of the date of this order.  The Alternative Payee [Ms. Garcia-Tatupu] will be treated as a participant in the Retirement Plan with respect to this percentage of the Player's accrued benefit, and may elect the form in which benefits will be paid and the time they will commence according to the following rules: The Alternate Payee may elect the life only pension, life and contingent annuitant pension . . . .

The 2011 *post mortem* domestic relations order also provided that if "the Alternate Payee is alive upon the Player's death, the Alternate Payee" is "treated as the Player's surviving spouse for the purposes of awarding death benefits with respect to the Player's remaining benefit under the Retirement Plan," unless "the Player is married to another person at the time of his death."

The Plan's Retirement Board in its letters of decision dated April 5, 2012 and September 19, 2012, concluded that the 2011 *post mortem* domestic relations order did not meet the requirements for recognition as a Qualified Domestic Relations Order.  The Retirement Board came to this conclusion because while a Qualified Domestic Relations Order may direct the payment to an alternate payee of benefits that are otherwise

4

payable to the participant, such an order may not create an additional benefit and make it payable under the Plan.  That, the Retirement Board decided, was what Ms. Garcia-Tatupu's 2011 *post mortem* domestic relations order did.

On October 5, 2012, after the first two written denials by the Retirement Board of her claim for benefits, Ms. Garcia-Tatupu obtained another *post mortem* order stating that the *post mortem* domestic relations order "entered on December 29, 2011, is hereby ordered *nunc pro tunc* to September 24, 1997." September 24, 1997 is the day that the Marital Separation Agreement was signed.  By its December 20, 2012 letter of decision, the Retirement Board declined to give force to the 2012 *nunc pro tunc* order as relevant to the creation of a Qualified Domestic Relations Order.

## II. PROCEDURAL BACKGROUND

Ms. Garcia-Tatupu brought this action on June 16, 2016, claiming that she was wrongfully denied pension benefits.  The Plan filed a motion to dismiss Ms. Garcia-Tatupu's claims.  I issued an order on April 18, 2017 denying the motion to dismiss. *Garcia-Tatupu* v. *Bert Bell/Peter* [sic] *Rozelle NFL Player Retirement Plan*, 249 F. Supp. 3d 570 (D. Mass. 2017).  I found I could not properly address the motion because the underlying Marital Separation Agreement was missing from the record.  *Id.* at 582.  The lack of that document made it impossible for me to

determine whether the Retirement Board had supportably concluded that the 2011 and 2012 *post mortem* state court domestic relations orders did not constitute Qualified Domestic Relations Orders for purposes of federal law, thereby properly denying Ms. Garcia-Tatupu benefits.  As part of renewed motion practice, the parties have made the underlying documentary record before me complete and I am now in a position to decide Ms. Garcia-Tatupu's right to pension benefits on the papers.  After analysis of the completed record, I will deny Ms. Garcia-Tatupu's motion to reverse the Plan's determination.

### III. STANDARD OF REVIEW

A decision made by a plan administrator, such as the defendant here, "with the authority and discretion to interpret the plan and to determine eligibility for benefits" must be upheld, unless that decision is "arbitrary, capricious, or an abuse of discretion."  *O'Shea through O'Shea* v. *UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016) (quoting *Niebauer* v. *Crane & Co.*, 783 F.3d 914, 922–23 (1st Cir. 2015)).  In order to decide that a plan administrator's decision was not "arbitrary, capricious, or an abuse of discretion," I must find that the plan administrator's decision was "plausible" and "supported by substantial evidence on the record."  *Id.*  Here, however, I primarily examine whether a proffered state domestic relations order is a Qualified Domestic Relations Order recognized by

6

ERISA.  Analyzing the requisites of a Qualified Domestic
Relations Order is "a question of statutory construction . . .
rather than a question of interpretation of the Plan," so I
examine this question *de novo*, without deference to the Plan
Administrator's interpretation.  *Samaroo* v. *Samaroo*, 193 F.3d
185, 189 (3d Cir. 1999).

Ms. Garcia-Tatupu frames the issue by means of a motion to
reverse the defendant's denial of benefits.  The Plan's
opposition to Ms. Garcia-Tatupu's motion asks for relief in the
form of summary judgment in its own favor.  On a summary
judgment motion, the moving party must show that, that "there is
no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.
In the context of record review under ERISA, summary judgment is
the customary formal procedural vehicle for framing the question
whether a plan administrator's decision should be left
undisturbed by the reviewing court.  However, in this context,
the non-moving party is not entitled to the usual inferences in
its favor.  *Orndorf* v. *Paul Revere Life Ins. Co.*, 404 F.3d 510,
517 (1st Cir. 2005).

## IV. ANALYSIS

Ms. Garcia-Tatupu argues that the terms of the *post mortem*
domestic relations orders and the Marital Separation Agreement
make clear that she was entitled to receive benefits.  Her

7

position is that the Plan Administrator's denial of benefits was
faulty because it was based on Mosiula Tatupu not having a
surviving spouse, despite the fact that the 2011 *post mortem*
domestic relations order provided that she should be so treated
and the 2012 *post mortem* domestic relations order makes this
2011 order applicable *nunc pro tunc* to the 1997 Marital
Separation Agreement.  I examine each of the relevant state
court orders at issue to analyze whether, in light of all of the
facts, Ms. Garcia-Tatupu had a valid Qualified Domestic
Relations Order[2] with which the Retirement Board wrongfully
refused to comply.

## A.    *The 1997 Marital Separation Agreement*

The Marital Separation Agreement is the touchstone of the
dispute.  It provides that Ms. Garcia-Tatupu has rights to one-
third of Mosiula Tatupu's pension benefits, but that Mosiula

---

[2] As will appear in the discussion that follows, it is only the
substantive provisions of the 2011 *post mortem* domestic order
that are actually at issue here.  The 2011 order is entitled to
recognition as a Qualified Domestic Relations Order only to the
degree it is consistent with the 1997 Marital Separation
Agreement, which is independently entitled to such recognition.
By the same token, the 2012 *nunc pro tunc* domestic relations
order does not provide any additional entitlement to recognition
for the 2011 *post mortem* order, unless the 2011 *post mortem*
order is itself consistent with the Marital Separation
Agreement.  Consequently, in discussing the basis for the
plaintiff's benefits claims in this litigation, I will, unless
otherwise indicated, be referring in the singular to the
substantive provisions of the 2011 *post mortem* domestic
relations order.

Tatupu had the "exclusive right to decide, if, when, and how he wishe[d] to receive said benefits, having the sole right to choose what payment option he desire[d] . . . ."  Furthermore, the Agreement states that "[w]hatever payment option Mosiula F. Tatupu elects shall govern the time amount and manner of payments to Linnea Garcia-Tatupu."  The Agreement also explicitly provides that the retirement and pension benefits continue to be payable after the death of Mosiula Tatupu, *if* the plan so provides.  Ms. Garcia-Tatupu waived any benefits in excess of the amount provided within the Marital Separation Agreement.

Thus, the Marital Separation Agreement defers to plan provisions to determine plan benefits.  What remains disputed is whether Ms. Garcia-Tatupu is entitled to survivor benefits that Mosiula Tatupu had not elected under the plan at the time of his death.  To resolve this dispute, I now turn to the *post mortem* domestic relations orders.

**B.   *The Post Mortem Domestic Relations Orders***

At the outset, the role of state *post mortem* orders should be addressed.  As I observed in my previous memorandum in this matter, *Garcia-Tatupu*, 249 F. Supp. 3d at 580-82, *post mortem* orders are not categorically inappropriate for purposes of defining the terms of a Qualified Domestics Relations Order.  Such *post mortem* orders are often necessary to clarify the terms

9

of marital property rights in a divorce setting after the change of circumstances occasioned by one party's death.  But if the *post mortem* order purports to increase plan benefits, it will not receive federal recognition as a Qualified Domestic Relations Order.

The defendant takes the position that the 2012 *nunc pro tunc post mortem* order must be disregarded "because it violates Massachusetts Law."  The defendant's argument depends upon a decision of the First Circuit in the immigration context. *Fierro* v. *Reno*, 217 F.3d 1 (1st Cir. 2000).  There, the First Circuit observed that "in Massachusetts, as in many other jurisdictions . . . a *nunc pro tunc* order is appropriate primarily to correct the record at a later date to make the record reflect what the court or other body intended to do at an earlier date but did not get around to doing through some error or inadvertence."  *Id.* at 5.  The First Circuit in *Fierro* also referenced case law "in the context of probate court orders, holding that these orders are controlling for purposes of federal tax liability only when the federal court determines that they are proper under state law."  *Id.* (citation omitted). The *Fierro* court hypothesized that "it could choose to disregard the probate court's modification order here as a misapplication of Massachusetts law."  *Id.*  Instead, however, the First Circuit "le[ft] the state law question undecided" and "rested" its

10

immigration law decision in *Fierro* "on a strictly federal ground."  *Id.* at 6.

As will appear more fully in Section IV.C. *infra*, in the ERISA context, Congress chose to by-pass any state law misapplication problem altogether by making the relevant determination about plan benefits one of federal law.  Only state court orders — whether *post* or *pre-mortem*, *nunc pro tunc* or simply *nunc* — which do not increase benefits spending beyond the terms of an ERISA plan, will receive federal recognition. That determination is purposefully a matter not of state law interpretation, or the propriety of *post mortem nunc pro tunc* orders under state law.  Congress sought to avoid the mischief evident in this case when a state law judge enters an order at best inattentive to and at worst in conscious disregard of ERISA plan provisions.  Such orders are treated as without force as a matter of federal law in order to assure uniformity in the regulation and administration of the nation's pension system.

### 1.   The 2011 Domestic Relations Order

The 2011 *post mortem* domestic relations order, which appears to be simply a judicial signature on a form of order prepared on the stationary of plaintiff's counsel, purports to permit Ms. Garcia-Tatupu to access benefits that Mosiula Tatupu had not yet elected to receive as of the time of his death.  I will explore below whether providing such a benefit to Ms.

Garcia-Tatupu creates a new benefit not otherwise payable, which
would prevent the domestic relations order from being a
Qualified Domestic Relations Order.   To summarize for present
purposes it is sufficient to observe that under the *post mortem*
2011 domestic relations order, the state court purported to make
Ms. Garcia-Tatupu an alternate payee under Mosiula Tatupu's
plan, giving her 100% of his accrued benefits, and all of the
surviving spouse benefits available under the plan.   The primary
issue is whether the 2011 *post mortem* fortified by the 2012 *nunc
pro tunc* domestic relations order thereby created a new benefit
not otherwise payable under the Marital Separation Agreement.

    2.   The 2012 Domestic Relations Order

    The 2012 *nunc pro tunc* order, which is also a judicial
signature supplied for a form of order set forth on the
stationary of plaintiff's counsel, purports to perform a
transmutation of the 2011 *post mortem* domestic relations order
designed to have its terms assimilated into the Marital
Separation Agreement entered some fifteen years earlier.   To
summarize this order for present purposes, it appears to be an
effort to ground the terms of the 2011 *post mortem* domestic
relations order in the earlier Marital Separation Agreement

without modifying the substantive terms of the 2011 *post mortem* order.[3]

## C.   *ERISA's Treatment of State Domestic Relation Orders*

Under the Employee Retirement Income Security Act ("ERISA"), a domestic relations order is a judgment made pursuant to state law that relates to the provision of various rights, including marital property rights to a former spouse. 29 U.S.C. § 1056(d)(3)(B)(ii).  A Qualified Domestic Relations Order "recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to the participant under a plan."  29 U.S.C. § 1056(d)(3)(B)(i).  A domestic relations order becomes a Qualified Domestic Relations Order when it:

> (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
> (ii) does not require the plan to provide *increased benefits* (determined on the basis of actuarial value), and
> (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order

---

[3] Because I find as a matter of federal law that the state *post mortem* domestic relations order does not constitute a Qualified Domestic Relations Order, I do not reach the knotty question what recourse the Plan would have — and in what forum — if the challenged state domestic relations order were found to be a Qualified Domestic Relations Order under federal law but is nevertheless arguably in violation of state law.

> previously determined to be a qualified domestic
> relations order.

29 U.S.C. § 1056(d)(3)(D) (emphasis added).

The 2011 *post mortem* domestic relations order provides that Ms. Garcia-Tatupu is entitled to receive "100% of the Player's accrued benefit under the Retirement Plan . . . ." Given that the Marital Separation Agreement only provides Ms. Garcia-Tatupu with one-third of Mosiula Tatupu's plan benefits, this is plainly an "increased benefit," especially given the previous payout of the early lump-sum payment. That portion of the state domestic relations order is by terms unenforceable under ERISA.

The remaining question is whether the provision in the 2011 *post mortem* domestic relations order effectively characterizing Ms. Garcia-Tatupu as a surviving spouse entitles her to benefits that Mosiula Tatupu had not yet begun receiving before his death and thereby directs an increased benefit not contemplated under the Marital Separation Agreement. If it does so, it makes that aspect of the 2011 *post mortem* domestic relations order also unenforceable. I examine several thoughtfully reasoned analogous cases from courts in the Third Circuit to gain some perspective.

In *Samaroo*, the plaintiff sought benefits under her ex-husband's pre-retirement survivor's annuity. 193 F.3d at 187. The plaintiff's ex-husband died at the age of 53, while still an

active employee of AT&T, which provided a pension plan with survivors' annuities based on the deceased employee's salary and years of service.  *Id.*  The plaintiff's ex-husband was vested but not yet eligible to receive retirement benefits at the time of his death, but if he had a surviving spouse, that spouse would have been eligible to receive an annuity.  *Id.*  After her ex-husband's death, the plaintiff obtained a *nunc pro tunc* amendment to their divorce decree creating an entitlement to those benefits.  *Id.* at 188.

The Third Circuit in *Samaroo* rejected the plaintiff's claim to rights as a surviving spouse as provided by her domestic relations order reasoning that since "annuity provisions of a defined benefit plan are a sort of insurance, based on actuarial calculations predicting the future demands of the plan"; consequently, determining the right to benefits at the time of the plaintiff's ex-husband's death was necessary to avoid "wreak[ing] actuarial havoc on administration of the Plan."  *Id.* at 190.  The court observed that before his death the plaintiff's ex-husband could have entered a valid Qualified Domestic Relations Order to give the plaintiff these benefits, but when he died "without remarrying or naming [the plaintiff] as alternate payee of the survivor's rights, the right to dispose of the benefits lapsed."  *Id.* at 191.  This approach did not deprive the plaintiff's ex-husband of any benefits under the

plan.  He had the right to remarry and provide survivorship
rights to a new wife and by the same token, had he given the
plaintiff survivorship rights, he would have lost the right to
convey these benefits on a new wife.  *Id.* at 190-91.  Since he
died before either contingency occurred, there was no survivor
right to exercise.  *Id.* at 191.

Six years later, the Third Circuit reexamined the breadth
of its holding in *Samaroo*.  *Files* v. *ExxonMobil Pension Plan*,
428 F.3d 478 (3d Cir. 2005).  In *Files*, the plaintiff's former
husband worked for ExxonMobil, and had a fully vested pension
with the company.  *Id.* at 480.  When he left the company he was
not yet old enough to receive benefits under his pension plan.
*Id.*  The plaintiff and her former husband signed a Property
Settlement Agreement two years after the plaintiff's ex-husband
became eligible to receive pension benefits, but he had not yet
elected to begin receiving benefits at that time.  *Id.*  This
agreement gave the plaintiff rights to one-half of her ex-
husband's ExxonMobil pension plan and one-half of his ExxonMobil
savings account.  *Id.* at 481.  The plaintiff's ex-husband
subsequently died, before ever electing to receive pension
benefits, and the question arose regarding whether the plaintiff
was still entitled to her ex-husband's pension benefits.  *Id.* at
481.

The plan administrator in *Files* decided not to treat the Property Settlement Agreement as a Qualified Domestic Relations Order because the agreement did not specifically indicate an award of survivor benefits to the plaintiff and the plaintiff's ex-husband had not yet commenced receipt of his pension benefits at the time of his death.  *Id.* at 482.  The plaintiff obtained a *nunc pro tunc* order and contended that the Property Settlement Agreement should serve as a Qualified Domestic Relations Order.

The *Files* court distinguished the facts from those in *Samaroo*, stating that: "First, in *Samaroo*, we determined that the decree evidenced an intention to divide only property rights existing at the time of the divorce, not an intention to give the ex-wife an interest in post-divorce earnings.  Second, we concluded that the decree only gave the ex-wife an entitlement to benefit payments when they were paid to the participant rather than 'conveying to her a portion of [her ex-husband's] interest in the plan.'"  *Id.* at 488 (internal citations omitted).  The plaintiff in *Files* had an interest in half of her ex-husband's pension through the Property Settlement Agreement, which was not limited to the property rights existing as of the date of divorce, and "[t]here was no question that [the plaintiff] could have enforced her right to receive that fifty percent interest on or after [her ex-husband's] fiftieth birthday (the date the pension became payable), separate and

apart from [her ex-husband's] election regarding the remaining fifty percent." *Id.* at 488.

A decade after *Files* was handed down, Judge Leeson in the Eastern District of Pennsylvania examined U.S. Department of Labor publications, which describe Qualified Domestic Relations Orders, to clarify the distinction between the treatment of the plaintiffs in *Samaroo* and *Files*. *Einhorn* v. *McCafferty*, No. 5:14-CV-06924, 2016 WL 1273937, at *2 (E.D. Pa. Mar. 31, 2016). He described two approaches used to divide pension benefits between spouses. *Id.*

One is the "shared payment approach," which "divides the pension benefits by splitting the actual benefit payments made with respect to a participant under the plan to give the alternate payee part of each payment." *Einhorn*, 2016 WL 1273937, at *2 (quoting U.S. Dep't of Labor, Emp. Benefits Sec. Admin., QDROs: The Division of Retirement Benefits through Qualified Domestic Relations Orders 29-30 (2014), http://www.dol.gov/ebsa/pdf/qdros.pdf).  Under this approach the beneficiary is not entitled to any payment unless the plan participant receives a payment or is already in pay status. This was the method by which the parties split benefit payments in *Samaroo*.

The second approach is the "separate interest approach" which "divides the participant's retirement benefit (rather than

just the payments) into two separate portions with the intent of
giving the alternate payee a separate right to receive a portion
of the retirement benefit to be paid at a time and in a form
different from that chosen by the participant." *Einhorn*, 2016
WL 1273937, at *2 (quoting U.S. Dep't of Labor, Emp. Benefits
Sec. Admin., QDROs: The Division of Retirement Benefits through
Qualified Domestic Relations Orders 30 (2014),
http://www.dol.gov/ebsa/pdf/qdros.pdf).  This is the approach
that the parties in *Files* used to distribute the pension
benefits.

I share Judge Leeson's view that the primary distinguishing
factor between *Samaroo* and *Files* is that the plaintiff in *Files*
had an independent right to her ex-husband's pension benefits,
rather than simply an interest in sharing in any benefit
payments that her ex-husband received.  Consequently, the
domestic relations order in *Files* was a Qualified Domestic
Relations Order because it did not require the plan to provide
increased benefits.

In reviewing the language of the pension and retirement
portion of the Marital Separation Agreement here, it is clear
that Ms. Garcia-Tatupu did not have an independent right to
elect to receive benefits.  In fact, Ms. Garcia-Tatupu only had
a right to one-third of the pension benefits that Mosiula Tatupu
received and she had no right to a share unless he directed such

19

a distribution.  Specifically, the Marital Separation Agreement provides that Ms. Garcia-Tatupu is entitled to receive "one-third (1/3) of the net benefit *he* receives from said pension benefit plan" (emphasis supplied).  That Ms. Garcia-Tatupu's benefits are tied to Mosiula Tatupu's benefits in a shared payment approach is further evidenced by the Agreement's provision that: "Mosiula F. Tatupu shall have exclusive right to decide, if, when, and how he wishes to receive said benefits," and "[w]hatever payment option Mosiula Tatupu elects shall govern the time amount and manner of payments to Linnea Tatupu." To be sure, the Agreement provides that "[s]aid benefits shall continue to be payable to Linnea Garcia-Tatupu subsequent to the death of Mosiula F. Tatupu . . . ."  However, this means only that Ms. Garcia-Tatupu would have continued to receive payments if Mosiula Tatupu had already opted in to receive payments.  In sum, Ms. Garcia-Tatupu has no independent right to seek benefits under the Marital Separation Agreement.  That agreement is drafted within the rubric for a "shared payment" approach as described in *Einhorn* and employed in *Samaroo*.

Ms. Garcia-Tatupu, like the plaintiff in *Samaroo*, agreed to a "shared payment" approach with her ex-husband.  In other words, the Marital Separation Agreement provides that Ms. Garcia-Tatupu is entitled to share in any actual benefit payments made to — and as directed by — Mosiula Tatupu.  But it

20

does not divide Mosiula Tatupu's retirement benefit into separate portions, or otherwise purport to give Ms. Garcia-Tatupu an interest independent from Mosiula Tatupu's interest in the Plan.  By subsequently purporting to give Ms. Garcia-Tatupu survivorship rights, thus allowing her to assert a separate interest in the Plan, the state *post mortem* and *nunc pro tunc* domestic relations orders have the effect of altering rights under the Marital Separation Agreement and providing benefits that were not otherwise payable upon Mosiula Tatupu's death. This is an increased benefit under 29 U.S.C. § 1056(d)(3)(D); therefore, the *post mortem* state domestic relations orders do not provide an enforceable Qualified Domestic Relations Order beyond the terms of the Marital Separation Agreement.

Accordingly, I conclude that the Retirement Board properly determined not to recognize any *post mortem* domestic relations order at issue here as a Qualified Domestic Relations Order.

### V. CONCLUSIONS

The plaintiff's motion [Dkt. No. 38] to reverse the defendant's decision denying retirement benefits is DENIED. Judgment shall enter for Defendant.


/s/ *Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

21